# J. W. KINCAID v. STATE.

No. A-1807. Opinion Filed December 6, 1913.

(136 Pac. 779.)

1. TRIAL—Instructions—Refusal of Instruction Covered. When the law pertaining to the defense has been clearly and correctly expounded in the instructions given, it is not error to refuse instructions which are merely cumulative.

2. APPEAL—Harmless Error—Argument of Counsel. In determining the effect of an improper statement made by the prosecuting attorney in the closing argument to the jury, the question is, Was the defendant prejudiced thereby? and the strength of the evidence supporting the conviction will be considered, and, where the guilt of the defendant is clearly established, it is not sufficient for a reversal.

3. HOMICIDE—Harmless Error—Failure to Instruct. Failure to instruct pursuant to Rev. Laws 1910, sec. 5902, relative to the burden resting on defendant in a murder case to prove mitigation or justification, being error in defendant's favor, is harmless.

*Appeal from District Court, McCurtain County;*
*A. H. Ferguson, Judge.*

J. W. Kincaid was convicted of manslaughter in the first degree, and appeals.   Affirmed.

Under an indictment which charged him with the murder of Levi Davis, in McCurtain county, on the 18th day of November, 1911, the defendant was convicted of manslaughter in the first degree.   On the 20th day of February, 1912, the court, in accordance with the verdict of the jury, sentenced him to imprisonment in the penitentiary for the term of seven years.   A substantial statement of the evidence is as follows:

A. C. Wood was the first witness for the state.   He testified: That he was 48 years of age and lived at Hochatown and was justice of the peace there.   That he was in Kincaid's store and heard Davis say to Kincaid that he had to settle with him right now or one or the other of them had to leave the world, and Davis walked out of the store still talking back to Mr. Kincaid.   That Kincaid followed him out with a pistol and he heard the pistol click and he spoke to him, calling him "Jim," and Kincaid fired two shots.   He went out and Davis was lying on the ground.   One shot entered the point of the left shoulder and the other entered above the eye.   The shooting occurred about 3 o'clock in the afternoon, and Davis died about two hours later.   That he saw Mr. Watson, Mr. Graham, Mr. Wilson, and Mr. Wiser in the store at the time of the killing.

A. T. Wood, the next witness, testified: That he was 22 years of age and son of witness A. C. Wood and at the time of the killing was working for Kincaid as bookkeeper.   That Davis had been working for Kincaid as fireman at the gin, and just prior to the killing Davis was at the office wanting a settlement out of Kincaid.   That the dispute between Davis and Kincaid was over both the store account and the time worked at the gin.   That Davis said that he would not settle and walked out.   That Kincaid kept a pistol there in the office at the store, and after Davis walked out some one came into the office, but witness could not say whether it was Kincaid or not.

T. W. Watson testified that he lived one mile and a quarter north of Hochatown, on a farm owned by Kincaid, and was running the gin for Kincaid at that time, and Davis was firing the

engine. That he was in the store at the time of the killing. He described the killing as follows:

"Mr. Davis was in behind the counter at the book desk, and just about the time I went in the store he came out from behind the counter and was walking towards the store door and made the remark that his time wasn't right, and they better settle with him and settle with him right or one or tother of them would quit the country, and repeated that word about the third time and stepped out on the store gallery. * * * About the time he came out from behind the counter, Mr. Kincaid told him that he would settle with him; to go on and get sober and he would settle with him; and, when he made the remark that they would settle with him right or one or tother of them would quit the country, the next thing I noticed Mr. Kincaid came out from behind the counter and made a start towards the door and shot Davis."

—that he heard Mr. Kincaid say that, "You say you would take my life or kill me, or something about those words." That Davis did not say a word. That Levi Davis and John Woods were working with him at the gin that day and both were drinking.

Will Wiser, the next witness for the state, testified: That he lived at Hochatown; was present at the shooting. He described it as follows:

"A. Well, the first I noticed of any dispute when I entered the house was when Mr. Davis come out from behind the counter where they was supposed to have been having a settlement, and he told Mr. Kincaid when he got ready to settle and settle right they would settle, and Mr. Kincaid told him that he would settle by them books; so Mr. Davis told him that he would settle with him and settle right or one or the other of them would leave the country, and walked on, and told him that he couldn't do him like he had been doing some of them Choctaws around there, or something to that effect; and Mr. Kincaid asked him did he say he would kill him, and he said 'No'; he didn't say that; and he asked again, and he said he didn't say it, and he fired on him the first shot."

—that he helped dress the body of the deceased and the wound on the forehead was powder burnt. That the deceased had nothing but a pocketknife which he had closed in his pocket. That he saw no other weapons.

Charley Burk, the next witness, testified: That he was present at the killing. He described the circumstances as follows:

"Q. Please state to the jury as best you can just what occurred there and what was said between Mr. Davis and Mr. Kincaid. A. Well, Mr. Davis come in there for a settlement. He was in there when I went in, and when I went in there I went after something; I don't remember what it was; I think it was some nails probably; and I stood there a few minutes. Mr. Kincaid was out then, went after some change for an old gentleman; so he said he would go to the house after the change, and, when he come back, why they was something said about the settlement, and Mr. Kincaid told Mr. Davis that he would settle according to them books, and that's the only way he would settle with him; said if he wanted to settle with them books they would settle; and Mr. Davis told him that he wouldn't settle with those books; that he didn't have him enough time for the day before, Friday, and he told him, well, he wouldn't settle with him that way; and Mr. Kincaid told him, 'All right, then;' that the books was there and he could settle with them if he wanted to; and so Mr. Davis told him whenever he—he just says, 'Whenever you commence to settle with me,' he says; and using some oath he says, 'You ain't beating any Choctaw over the head with a plow point;' and Mr. Kincaid was standing there and he started back toward that little office on the north side of the house, and as he come out from behind the counter he says, 'If I have to kill you, I will kill you;' and he walked on past me, and I was standing something near eight feet of them, I guess, six or eight feet, and I told him, I says, 'Don't do that, Jim; that's bad business;' and he went on. He got something like a foot or two feet of the door, and he raised his gun and fired a shot, and Mr. Davis fell, and, after he fell, why he walked up and stuck the gun down and shot him in the forehead, and when he done that he turned around and walked toward the north end of the porch about six or eight feet, I suppose about six feet, and he says, 'Is there anybody else here wants to kill me?' and when Mr. Kincaid walked on around the house I just turned around myself and walked out the back door, and as I walked out the back door Mr. Kincaid he was walking around at the west door or north of the west door, that I come out of, and that's the last I saw of him."

Roy Wilson testified that he lived at Hochatown and was present at the killing. He described it as follows:

"A. Well, when I came into the house, Mr. Davis was behind the counter where the bookkeeper was, Mr. Fred Wood. He was keeping books at that time. I supposed he was trying to straighten up his time. He had been working for Mr. Kincaid and just as I came into the house I heard Mr. Davis ask Mr. Wood if seven hours was all he got for a day's work. That's the first thing I heard as I came into the house; and Fred Wood said, 'That's all I give you; that's all the time I give you;' or something to that effect. That Mr. Davis turned towards Mr. Kincaid and walked towards him and asked him if seven hours was all he got for a day's work, or over a day, from daylight until dark; and Mr. Kincaid just answered, 'I didn't keep the time; Fred Wood keeps the books;' and Mr. Davis just turned and walked out from behind the counter behind me and walked towards the front door, and, as he walked towards the door, he just says, 'I won't settle that way; you are going to settle with me right;' and he walked to the front of the house and got out of the door on the edge of the porch, just on the outside of the door, and turned back facing the house, and as he turned back he says, 'Jim,' he says 'you are going to do me like you do these damned Indians, beat me around over the head.' He repeated it again, 'You are going to settle with me right, and going to settle right or me or you one will leave the country.' Mr. Kincaid was to my back. I just heard him say, 'Do you mean that you are going to kill me?' and turned and walked back towards the bookkeeper's office. I never looked at him to see what he was going after or anything about it. I was watching Mr. Davis more than anything else. But as he come out, around the counter behind me (he had his right side to me), come out around me, and after he got far enough past me towards the door that I could see his right hand, I saw the gun. He got somewhere near the center of the house from the end of the counter and the door and he asked Mr. Davis, 'Did you say that you was going to kill me?' and Mr. Davis just raised his hand and says, 'No, I didn't say that, Jim;' and then Mr. Kincaid repeated it again, says, 'Did you say that you was going to kill me?' He raised his hand the second time and said, 'I didn't say that;' and about that time the first gun fired. Q. About what part of the building—how far was it from the door? About how far when he fired this first shot? A. Well, as well as I understand it, somewhere between 8 and 12 feet. Q. Somewhere about halfway between the end of the first section of the counter and the door? A. Yes, something near that. Q. All right; go ahead and state what else, if anything? A. Well, when Mr. Kincaid

fired the first shot, why Mr. Davis fell backwards and he hit the post; his shoulders or some part of him hit the post; fell backwards and struck a post, and it knocked him forward, and he just fell kinda hunkered down sort of on his side; not side, but side of his head and back. Not plumb on his side, but the side of his head was on the floor. Didn't lack much; and Mr. Kincaid had just went up and made a second shot; didn't look to me like he checked up; just walked up and got right close to him and sort of stooped over and fired the second shot in his head. Q. Did you see the wounds, Mr. Wilson? A. Yes, sir; I did. Q. How many, and what part of the body did the balls take effect? A. One of them struck him in the left shoulder right about there (indicating), and the other one struck him in the head right along there and come out right by his right ear—over it. Q. Did you say Mr. Davis raised his hand and you held up your left hand? Which one did Mr. Davis raise? A. Mr. Davis raised his left hand. Q. Who was in the room, if you know, in the store at that time? A. Well, there was several. I don't know how I could call all the names. There was Fred Wood, he was in the office. Mr. Cam Wood was in the store, and Mr. Wiser and a fellow by the name of Graham, Charley Burks, and Mr. Watson, and there were an Indian woman in there. I don't remember now—yes, Will Wiser. I don't remember whether there was anybody else or not. Q. Did you see Charley Burk in there? A. No, I didn't see Charley Burk until after this happened, and they all began to stir around, and Charley was there then. Q. Did you help dress the dead man? A. Yes, sir; I did. Q. How long after the shooting was it before you was out to the body? Out to where he fell? A. I believe about three or four minutes. Q. Did you notice any weapons, any gun or any kind of weapon, on Mr. Davis during any of the time of the quarrel up until the time he was shot? A. Did not. Q. Did you see any weapons on or about him after he fell and was shot? A. Well, they were a pocketknife in his pocket that night when we dressed him. Q. Do you remember how he was dressed? A. Yes, yes, sir; he was running the engine there at Hochatown for Mr. Kincaid for the gin, and he had a pair of pants and a pair of overalls over them, and the knife was in his pants pocket under the overalls."

The state rests. James W. Kincaid, the defendant, as a witness in his own behalf, testified: That he had been living in Hochatown and vicinity for about seven years. That he had been engaged in farming, stock raising, gin, mercantile, and saw-

mill business. That deceased had been working for him as fire-man at the gin. That on the morning of the difficulty witness went from his store to the gin and there was nobody there, and he got his team and hauled wood to the gin; got back with the first load about 10 o'clock, and saw that Davis was drinking; unloaded and went after second load and got back between 12 and 1 o'clock. At that time he considered Davis drunk and went up into ginhouse and told Watson to shut down the gin; then went home to dinner. Watson came while defendant was eating dinner and asked to let him run until he could finish the ginning they were then on. Witness told him to do it but to look after the boiler. After dinner he went back to gin and had it shut down.—

"Davis came up and said I had fired him. I told him I hadn't fired him. He said, 'By God, he was going to have a set-tlement with me; that he had been wanting to do something for me to fire him for; and by God he done it, and he could whip me and could whip that long-legged clerk of mine.' Left the gin and went to the store and wasn't there but a short time until they come and wanted me to number and brand a bale of cotton. Went back to the gin for this purpose. Davis come up again and told me I had fired him and had to settle with him; that, 'By God, he was the best man there was on the ground.' I said if I had to fight my way out I had as well get ready for it. I again went to the store to keep away from him. After I was there some little bit I had to weigh some cotton at the scales about 20 or 30 steps northeast of the store. Davis followed me out there. I had my pistol. While I was weighing the cotton he helped me roll the cotton on the scales and take it off and roll it inside of the cotton yard, and when I would do that he would throw himself up against me, and when I would go to weigh the cotton he would pass, and he would rub against me and tell me he was the best damned man there was there, and if I said anything he would whip me. I never said anything to him. After I weighed the cotton I went to the house to keep away from him. After this it seemed like Davis had quieted down, and I went and put up my gun. Davis met me as I was going from the store to the house and said, 'By God, you are slipping off, by God, trying to keep from settling with me.' I told him, 'No, I am not.' He says, 'You are going to settle with me.' I says, 'Levi, I ain't fired you at all; go and get sober and let's

have no trouble at all.' During the afternoon Cam Wood told me to be on my guard; that Davis had said that one or the other of us would quit the world. After I came back from the house to the store I noticed Davis looking through the front window. He appeared to be mad. After that I again went and got my gun. Some minutes after that Davis came into the store. I· was in the north side waiting on a customer. He demanded a settlement, and I told Fred to straighten up the books and settle with him, if nothing else would do. Davis then went into the office. After he and Fred Wood was there some time, Wood called me. I didn't go up until he called again, and when I got there Davis said he had put in more time than that and wasn't going to settle that way. I said, 'I haven't kept the books; I am willing to settle with you and give you all the time that's coming to you.' That I didn't want anything only what was right both ways. When I said that Davis passed out by me. He was mad and said: 'No, I am not going to settle by your books at all. I won't settle any such way. By God, I am going to have my time, and you have got to settle with me, or you or me one will quit the world.' He repeated that as many as three times. He went quartering towards the south side of the door as he went out. I thought his intention was to try to get the advantage of me and kill me. I had my gun and just walked up quartering towards the door in order to keep in sight of him. When he got outside the door he turned and said, 'I will kill you, and I will kill you now.' Instantly as he turned back and said that, he throwed his right hand holding his pants like he· was trying to get a gun. I immediately shot twice as fast as I could. The first shot didn't make any change in him. I shot to keep him from killing me. I was near the door when I shot the first time and right at the door the second shot. I was stepping forward all the time. Davis was standing when I fired both shots. He had a coat on. Davis never said he didn't want to hurt me."

*Armstrong & Etheridge* and *Steel, Lake & Head,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty. Gen., for the State.

DOYLE, J. (after stating the facts as above). The assignments of error relied upon for reversal of the judgment are, in effect, as follows: That the court erred in refusing to give the

instructions requested by the defendant; misconduct of the prosecuting attorney in his argument to the jury.

The charge of the court contained nineteen instructions. No objection was made nor exception taken to any instruction given. The defense requested the court to give eleven additional instructions. It is our opinion that the requested instructions were properly rejected, as all the law pertaining to the defense had been clearly and correctly expounded in the instructions given, which were more favorable to the defendant than the law contemplates.

Our Code of Criminal Procedure provides (section 5902, Rev. Laws 1910) that:

"Upon a trial for murder, the commission of the homicide by the defendant being proven, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable."

The court should have given an instruction based upon the foregoing section. See *Culpepper v. State,* 4 Okla. Cr. 103, 111 Pac. 679, 31 L. R. A. (N. S.) 1166, 140 Am. St. Rep. 668. However, its failure to do so was an error in favor of the defendant, of which he cannot complain. When the defendant has had the benefit of a fair trial by an impartial jury, selected conformably to law, and fully and fairly instructed in every principle of law applicable to his defense, with no rulings against him that would tend to prejudice a substantial right or deprive him of his defense, he has received all that any citizen can rightfully demand.

During the closing argument of counsel for the prosecution, the assistant prosecutor made the following statement:

"Now, gentlemen of the jury, of all the dark and bloody and black murders that have ever been committed in McCurtain county, this is the blackest and the dirtiest, and unless you convict the defendant you may expect many more such dark and bloody murders."

At which time counsel for the defendant took an exception. Thereupon the court admonished the counsel not to make use of

such language before the jury. We think this statement went beyond the limits of legitimate argument and was improper. In determining the effect of an improper statement made by the prosecuting attorney in the closing argument to the jury, the question is, Was the defendant prejudiced by such improper statement? and the strength of the evidence supporting the conviction will be considered.

The evidence in this case is that the defendant, without any provocation, deliberately shot the deceased, and, not satisfied with this, he stepped up to the prostrate form of his victim and shot him a second time. The evidence proved beyond all reasonable doubt that the homicide was murder. There was no room for even a probability that it was manslaughter in the first degree, nor was there any evidence fairly raising, or tending to raise, the issue of self-defense. We would not have reversed the judgment if the court had omitted to charge upon the issue of manslaughter in the first degree, because in our opinion the facts of the case did not demand that this issue be submitted.

The defendant, without excuse, unjustifiably, with a premeditated design to kill and murder, shot and killed Levi Davis. The jury in mercy, or in charity for the weakness of human kind, or possibly through a mistaken view of the law, lessened his crime to manslaughter in the first degree, and he should be satisfied with his conviction for the lesser offense.

A careful examination of the whole case leads to the conclusion that no error has been committed, to the defendant's prejudice. The judgment is therefore affirmed.

ARMSTRONG, P. J., and FURMAN, J., concur.